**THIRD DIVISION
BARNES, P. J.,
BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 24, 2014**

# In the Court of Appeals of Georgia

A14A0143. ROCA PROPERTIES, LLC et al. v. DANCE HOTLANTA, INC. et al.

BARNES, Presiding Judge.

This lawsuit involves a dispute over the sale of a professional ballroom dance competition in Atlanta. Dance Hotlanta, Inc., the successor by merger to Hotlanta Dance Challenge, Inc., and Nancy Senner (collectively, the "HDC Plaintiffs") sued Roca Properties, LLC, Elizabeth Chester, and Antonio Daza (collectively, the "Roca Defendants") for breach of certain promissory notes and personal guarantees associated with the sale of the dance competition, prejudgment and postjudgment interest, and attorney fees. The Roca Defendants answered, alleging that they had been fraudulently induced into signing the notes and guarantees, and asserting counterclaims for breach of contract, fraud in the inducement, indemnification, attorney fees, and punitive damages. The trial court granted summary judgment to the

HDC Plaintiffs on all of the claims and counterclaims, concluding that the uncontroverted evidence showed that the notes were in default and that the HDC Plaintiffs had not made any actionable false representations to the Roca Defendants that induced them to enter into the sale. For the reasons discussed below, we conclude that genuine issues of material fact exist in this case, and we vacate the trial court's summary judgment order and remand with instruction.

Summary judgment is proper only if the pleadings and evidence show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). "We apply a de novo standard of review to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." (Punctuation and footnote omitted.) *Bonner v. Southern Restaurant Group*, 271 Ga. App. 497 (610 SE2d 129) (2005).

*The Hotlanta Competition.* The Hotlanta Dance Challenge is an annual ballroom dance competition held in Atlanta every third week in October (the "Hotlanta Competition"). The Hotlanta Competition is sanctioned by the National Dance Council of America ("NDCA"), which is the official governing council of dance competitions in the United States. Under NDCA rules, no other NDCA-

2

sanctioned competition can take place within 90 miles from the Hotlanta Competition during the week it is held. Furthermore, at the time of this dispute, there were no new competition dates available from the NDCA; thus, a party interested in hosting a NDCA-sanctioned competition had to acquire the rights from an existing owner.

Nancy Senner and her former dance partner and boyfriend, Edwin Rivera, also known as "Eddie Ares" ("Ares"), were the founders of the Hotlanta Competition. Senner and Ares organized and hosted the Hotlanta Competition each year from its inception through 2009. During that time period, the business of the Hotlanta Competition was conducted through various companies owned solely by Senner, including Hotlanta Dance Challenge, Inc. ("HDC").[1]

*The Rising Star Ball.* For many years, Senner and Ares operated the Hotlanta Competition in a single ballroom at an Atlanta area hotel. However, in 2006, Ares developed the concept of the "Rising Star Newcomers Ball," a competition for amateur dancers who might be intimidated by the level of competition in the main ballroom (the "Rising Star Ball"). Ares registered the name with the United States Patent and Trademark Office, and Senner registered "Rising Star Newcomers Ball,

---

[1] HDC later merged into Dance Hotlanta, Inc., which was also owned solely by Senner.

Inc." with the Georgia Secretary of State "to protect the name," even though the registered corporate entity never had an organizational meeting or issued any stock.

From 2006 through 2009, the Rising Star Ball was conducted in a second ballroom in conjunction with the Hotlanta Competition. The Rising Star Ball had its own entry forms. The single brochure for the Hotlanta Competition and Rising Star Ball was divided into separate parts for the two events and listed separate schedules and check-in dates. The Hotlanta Competition and Rising Star Ball also gave out separate prizes. Moreover, Ares testified that, unlike the Hotlanta Competition, the Rising Star Ball was not sanctioned by the NDCA.

Ares enjoyed organizing and hosting the Rising Star Ball because of the "energy and enthusiasm" of the amateur dancers. After the 2009 event, Ares informed Senner that he wanted to organize and operate a new dance competition circuit exclusively for amateurs, which he named the "Rising Star Friendly Circuit" (the "Rising Star Circuit"). The Rising Star Circuit would be unaffiliated with the NDCA. Senner and Ares agreed that Senner would continue to organize and host the Hotlanta Competition through her company HDC, while Ares would leave HDC to run his Rising Star Circuit.

*Initial Negotiations with the Roca Defendants.* In early 2010, Elizabeth Chester contacted Senner to see if she would be interested in having an additional partner or selling the Hotlanta Competition. Their discussions led to negotiations between the parties over the sale of the assets of HDC and the associated personal goodwill of Senner to Roca Properties LLC, a company owned by Chester and Antonio Daza. Both sides were represented by counsel throughout the negotiations. Michael Reeves, a potential investor in Roca Properties, also was involved in the negotiations.

In March 2010, Chester, acting on behalf of Roca Properties, signed a letter of intent to purchase the assets of HDC and the personal goodwill of Senner for a total purchase price of $400,000. The letter stated that it was the intent of HDC to sell to Roca Properties its assets "as they relate solely to the Competition," defined as "the dance competition known as the 'Hotlanta Dance Challenge' held in Atlanta, Georgia." The letter of intent made no reference to the Rising Star Ball.

*Senner's Handwritten Notes.* During the parties' negotiations, Senner provided the Roca Defendants with corporate tax returns for the years 2007 and 2008. But the 2009 tax return for HDC had not yet been filed and thus was unavailable for the Roca Defendants to review. Nor did Senner provide any financial software or income

statements, balance sheets, or a general ledger for 2009 that could be reviewed by the Roca Defendants.

Senner did provide the Roca Defendants with a copy of her undated handwritten financial notes drafted as part of the negotiations, but the parties dispute whether the notes contained financial information for 2009. According to the Roca Defendants, Senner's handwritten notes included revenue and expense figures for the 2009 Hotlanta Competition. In contrast, Senner contended that her notes were nothing more than projections for additional revenue sources and lower operating expenses for the Hotlanta Competition in future years.

*The Number of Paid Entries.* During the parties' negotiations, Senner also provided the Roca Defendants with a computer printout reflecting that there had been 7,195 paid entries for the 2009 Hotlanta Competition. An "entry" represented a fee paid for a contestant for one dance. Senner did not tell the Roca Defendants that the 7,195 figure included paid entries for the 2009 Rising Star Ball.

*The Purchase Transaction.* Based on Senner's representations and the financial documents and information provided by her, Roca Properties entered into an Asset Purchase Agreement with HDC and Senner on April 8, 2010 (the "Purchase Agreement"). Under the terms of the Purchase Agreement, Roca Properties agreed to

6

buy certain itemized assets of HDC associated with the Hotlanta Competition for $200,000.

The Purchase Agreement and the schedules attached to it made no reference to the Rising Star Ball and whether or to what extent any rights to it would be retained by Ares. But the Purchase Agreement did provide that the parties would "use their reasonably best efforts to cause . . . Ares" to enter into a "Release, Non-Compete and Non-Disparagement Agreement" with the parties for a two-year period. Schedule 3.5 to the Purchase Agreement further specified that good and marketable title to HDC's assets excluded "[a]ny legal or equitable interest claimed by . . . Ares," unless and until he released and transferred any such claimed interest to the parties as part of the contemplated non-compete agreement.

Contemporaneously with the execution of the Purchase Agreement, Roca Properties also entered into an Agreement for Sale and Purchase of Personal Goodwill (the "Goodwill Agreement"). Under the Goodwill Agreement, Roca Properties agreed to buy the personal goodwill of Senner related to the Hotlanta Competition for $200,000.

Pursuant to the terms of the Purchase Agreement and Goodwill Agreement, Roca Properties paid $100,000 to HDC and $100,000 to Senner at closing. Roca

7

Properties also entered into two promissory notes for $100,000 each as part of the purchase transaction: one in favor of HDC and one in favor of Senner. That same day, Chester and Daza each signed a personal guaranty for the two notes.

*The Non-Compete Agreement with Ares.* A month after the purchase transaction, Senner, HDC, and Ares executed a "Release, Non-Compete/Non-Solicit, and Non-Disparagement Agreement" (the "Non-Compete Agreement"). Pursuant to the terms of the Non-Compete Agreement, Ares agreed not to sponsor or conduct a dance competition at the same time as the Hotlanta Competition. Under a paragraph entitled "Additional Consideration," the Non-Compete Agreement further provided that Ares would be conveyed "the intangible and tangible property described in the attached *Exhibit A.*"

Exhibit A to the Non-Compete Agreement listed the property conveyed to Ares, which included "[a]ny and all interest in the Rising Star Newcomers Circuit," "[a]ny and all interest in the Rising Star Newcomers Ball," and "[a]ny and all interest in the Georgia entity registered with the Secretary of State and known as 'Rising Star Newcomers Ball, Inc.'" Exhibit A also listed a series of personal items that would be conveyed to Ares, such as a sofa and floor lamp, that had been located in Senner's house. Although the Non-Compete Agreement had a signature line for Roca

Properties, counsel for Roca Properties testified that the company refused to sign it because the inclusion of the personal items in Exhibit A "muddied the waters."

*Operation of the Rising Star Circuit.* Ares founded and organized the Rising Star Circuit of amateur ballroom dance competitions as he had planned. Ares initially intended to use the name "Rising Star Newcomers Ball" for the annual grand finale event for his Rising Star Circuit of amateur competitions held in Atlanta. However, he ultimately changed the name of the grand finale event to the "American Dance Classic." The American Dance Classic has been held every October since 2010, after the Hotlanta Competition held the same month.

*The 2010 and 2011 Hotlanta Competitions.* The Roca Defendants organized and hosted the Hotlanta Competition in 2010 and 2011. They did not host an amateur competition in a separate ballroom. The number of paid entries for the 2010 competition was 3,120 and for the 2011 competition was 2,958. Roca Properties did not make a profit on either the 2010 or 2011 Hotlanta Competition. Consequently, Roca Properties chose not to host a Hotlanta Competition in 2012.

*Post-Closing Financial Disclosures.* The Roca Defendants learned that the figure of 7,195 paid entries for the 2009 Hotlanta Competition that had been supplied to them by Senner included the number of paid entries for the Rising Star Ball.

Excluding the paid entries for the Rising Star Ball, the number of paid entries for the 2009 Hotlanta Competition had only been 4,911. According to the Roca Defendants, they would not have entered into the purchase transaction had they known the true number of paid entries for the 2009 Hotlanta Competition.

Additionally, after the 2010 and 2011 Hotlanta Competitions, the Roca Defendants began to question the figures that had been provided to them by Senner in her handwritten notes. HDC had filed its 2009 tax return after the closing of the purchase transaction, and it showed revenues of $261,767, expenses of $238,711, and profit of $23,056. If Senner's handwritten notes were meant to show the 2009 financial performance of HDC, the financial figures in the notes reflected a profit significantly higher than what was shown on the 2009 tax return. The Roca Defendants asserted that they would not have entered into the purchase transaction if they had known the actual financial condition of HDC in 2009 as reflected in the tax return.

*Dispute over Payment of the Notes*. Roca Properties did not make payment on the promissory notes to HDC and Senner when they became due. In February 2012, the Roca Defendants advised HDC and Senner that they were rescinding the notes and guarantees because they had been fraudulently induced to enter into the purchase

10

transaction by Senner. According to the Roca Defendants, they would not have purchased the assets of HDC and Senner's associated goodwill or signed the notes and guarantees, had they known the true number of paid entries for the 2009 Hotlanta Competition and the actual financial condition of HDC for that year.

*The Lawsuit.* The HDC Plaintiffs sued the Roca Defendants for breach of the promissory notes and related personal guarantees, prejudgment and postjudgment interest, and attorney fees. The Roca Defendants answered and asserted counterclaims for the breach of certain express warranties contained in the Purchase Agreement, fraud in the inducement, indemnification under the terms of the Purchase Agreement, attorney fees, and punitive damages.

Following discovery, the HDC Plaintiffs moved for summary judgment on all of their claims and the Roca Defendants' counterclaims, contending, among other things, that the uncontroverted evidence showed that the Roca Defendants had defaulted on the notes and guarantees and had not been fraudulently induced into entering into the purchase transaction. The Roca Defendants responded that there were genuine issues of material fact as to whether they were fraudulently induced to enter into the purchase transaction by Senner's misrepresentations about the number

11

of paid entries for the 2009 Hotlanta Competition and about the financial condition of HDC in 2009.

Concluding that no genuine issues of material fact existed, the trial court granted summary judgment in favor of the HDC Plaintiffs on all of the claims and counterclaims. The trial court found that the uncontroverted evidence showed that the HDC Plaintiffs had not made any actionable false representations to the Roca Defendants about the number of paid entries for the 2009 Hotlanta Competition or the 2009 financial performance of HDC, and that there was no evidence that the Roca Defendants actually relied on any alleged misrepresentations about HDC's 2009 financial performance. The trial court thereafter entered final judgment in favor of the HDC Plaintiffs and jointly and severally against the Roca Defendants, awarding the HDC Plaintiffs the principal amount owed on the notes, prejudgment and postjudgment interest, and attorney fees and costs. This appeal followed.

1. We first address the trial court's grant of summary judgment in favor of the HDC Plaintiffs on their claims for breach of the promissory notes and personal guarantees. According to the Roca Defendants, a genuine issue of material fact exists as to whether they were fraudulently induced to enter into the notes and guarantees, and the trial court erred in concluding otherwise.

A creditor suing on a promissory note establishes a prima facie case to judgment as a matter of law by producing the note and showing that it was signed by the debtor and is in default. *Lovell v. Georgia Trust Bank*, 318 Ga. App. 860, 863 (2) (734 SE2d 847) (2012); *Speir v. Nicholson*, 202 Ga. App. 405, 408 (2) (414 SE2d 533) (1992). Once a prima facie case has been made by the creditor, the burden of production shifts to the debtor to produce or point to evidence that establishes an affirmative defense. *Big Sandy Partnership v. Branch Banking & Trust Co.*, 313 Ga. App. 871, 872 (1) (723 SE2d 82) (2012). Fraud in the inducement is a good defense to the enforceability of an obligation to pay a promissory note. *Jocelyn Canyon, Inc. v. Lentjes*, 292 Ga. App. 608, 611 (664 SE2d 908) (2008); *Morgan v. Hawkins*, 155 Ga. App. 836, 837 (1) (273 SE2d 221) (1980). Mindful of these principles, we turn to the specific allegations of fraudulent inducement alleged by the Roca Defendants.

(a) *The Number of Paid Entries for the 2009 Hotlanta Competition.* In opposing summary judgment, the Roca Defendants alleged that they had been fraudulently induced to enter into the notes and guarantees by Senner's misrepresentation about the number of paid entries for the 2009 Hotlanta Competition. According to the Roca Defendants, the evidence showed that they acquired the Hotlanta Competition, not the Rising Star Ball, when they purchased the

13

assets of HDC pursuant to the Purchase Agreement. Senner, however, included the number of paid entries for the Rising Star Ball in the number that she represented to the Roca Defendants as being the number of paid entries for the 2009 Hotlanta Competition. The Roca Defendants argued that by including entry figures for the Rising Star Ball, a jury could find that Senner misled them about the size and success of the 2009 Hotlanta Competition.

The trial court rejected the Roca Defendants' argument, finding that the uncontroverted evidence showed that the amateur dance competition known as the Rising Star Ball was not a separate event from the Hotlanta Competition. Consequently, the trial court concluded that when the Roca Defendants acquired the Hotlanta Competition from HDC, they also acquired the right to host an amateur dance competition in a second ballroom. According to the trial court, "Rising Star Ball" was nothing more than a registered trade name, and even if Ares retained the rights to the name, it did not make the entry numbers supplied by Senner misleading. Rather, the trial court reasoned, because the Roca Defendants had been conveyed the right to host an amateur dance competition in a second ballroom "under another name had they so chosen," the inclusion of the entry numbers for Rising Star Ball in the number supplied by Senner was not misleading and did not constitute a

14

false representation as a matter of law. The trial court's findings and conclusions were in error.

(i) *Evidence that the Rising Star Ball Was a Separate Event.* As an initial matter, there was evidence from which a jury could find that the Rising Star Ball was a separate event from the Hotlanta Competition. In this regard, the Roca Defendants pointed to evidence that the Rising Star Ball was conducted in a separate ballroom from the professional dance competition, that the brochure for the Hotlanta Competition and Rising Star Ball was divided into separate parts for the two competitions, and that the Rising Star Ball had its own entry forms, schedule, check-in days, and awards. In addition, there was evidence that the Hotlanta Competition was founded in 1997 by Senner and Ares, while the Rising Star Ball was founded in 2006 solely by Ares. Ares also testified that unlike the Hotlanta Competition, the Rising Star Ball was not sanctioned by the NDCA. Finally, there was evidence that Senner registered a separate entity named "Rising Star Newcomers Ball, Inc." with the Georgia Secretary of State. This combined evidence, construed in favor of the Roca Defendants, would support a finding by a jury that the Rising Star Ball was a separate event from the Hotlanta Competition. Hence, contrary to the trial court's conclusion, there was some evidence that the Rising Star Ball was more than simply

15

a registered trade name; construed in favor of the Roca Defendants, the evidence showed that it was a separate dance competition, the tangible and intangible rights to which were distinctive from any rights associated with the Hotlanta Competition.

Accordingly, the operative question is whether the Roca Defendants acquired any right or interest in holding the Rising Star Ball when they purchased the assets of HDC. We conclude that there was evidence from which a jury could answer this question in the negative. While the language of the Purchase Agreement was ambiguous on this point, there was parole evidence from which a jury could find that the parties understood that Ares would retain all of the rights to the Rising Star Ball.

(ii) *The Language of the Purchase Agreement.* The "cardinal rule" of contract construction "is to ascertain the intention of the parties." OCGA § 13-2-3. "Where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties." (Citations and punctuation omitted.) *Municipal Elec. Auth. of Ga. v. Gold-Arrow Farms, Inc.*, 276 Ga. App. 862, 866 (1) (625 SE2d 57) (2005). But if the contract contains an ambiguity that cannot be resolved through the rules of construction, the court may look outside the written terms of the contract and consider parole evidence. Id. at 866-867 (1). See OCGA § 13-2-2 (1). And if the parole evidence is in conflict, "the question of what the parties intended becomes a factual

16

issue for the jury." (Citations omitted.) *Dye v. Mechanical Enterprises, Inc.*, 308 Ga. App. 311, 314 (708 SE2d 24) (2011). See *DJ Mortgage, LLC v. Synovus Bank*, 325 Ga. App. 382, 391-393 (2) (a) (i) (A) (III) (750 SE2d 797) (2013).

Here, the Purchase Agreement recites that HDC is "the owner of the certain assets including but not limited to the name, service mark, and sanctioned approval of a certain dance competition held annually in Atlanta, Georgia and known as the 'Hotlanta Dance Competition' (the 'Competition')," and that Roca Properties wishes to acquire from HDC "substantially all of the assets used in promoting and conducting . . . [the] Competition, upon the terms and subject to the conditions hereinafter set forth."

The "assets" of HDC being purchased by Roca Properties are defined by the Purchase Agreement to include "all of the assets, rights, interests, client lists, client files, intellectual property . . . used by the Competition," with the "assets" more fully described in an attached schedule of "Purchased Assets." The list of "Purchased Assets" includes "all other properties and assets of every kind and nature, tangible or intangible owned by [HDC] and used for or held for use in connection with the Competition, other than real property." Also attached to the Purchase Agreement is a schedule of "Excluded Assets."

17

The Purchase Agreement also contains provisions relating to the rights and interests claimed by Ares. Section 2.7 of the Purchase Agreement states that the parties will "use their reasonably best efforts to cause . . . Ares" to enter into a "Release, Non-Compete and Non-Disparagement Agreement" with the parties for a period of two years. Schedule 3.5 further specifies that good and marketable title to HDC's assets excludes "[a]ny legal or equitable interest claimed by . . . Ares," unless and until any such claimed interest is released and transferred to the parties "pursuant to the requirements of Section 2.7."

Taken together, these provisions of the Purchase Agreement are ambiguous regarding the conveyance of the Rising Star Ball. Notably, although the Purchase Agreement contains a broad definition of the "Assets" and the "Purchased Assets" conveyed to the Roca Defendants, it makes no reference to any right or interest in the Rising Star Ball in its definition of the "Competition" or "Assets," in its schedules of "Purchased Assets" and "Excluded Assets," or in any other paragraph or schedule. Furthermore, while Schedule 3.5 indicates that certain "legal or equitable interest[s]" are being retained by Ares unless and until he transfers those rights to the parties as part of a non-compete agreement, the Purchase Agreement does not further specify what particular "interests" are being retained by Ares.

18

Under these circumstances, it is simply unclear from the language of the Purchase Agreement whether the Roca Defendants were being conveyed any right or interest in holding the Rising Star Ball when they purchased the assets of HDC, or whether Ares was retaining all of the rights to the Rising Star Ball. Moreover, the parties have not pointed to any rules of construction that would resolve the ambiguity, and we have found none. Therefore, we may look outside the four corners of the Purchase Agreement and consider parole evidence. See *Municipal Elec. Auth. of Ga.*, 276 Ga. App. at 866-867 (1).

(iii) *The Parole Evidence.* Our review of the parole evidence leads us to conclude that there was evidence from which a jury could find that the parties never intended for the Roca Defendants to obtain any right or interest in holding the Rising Star Ball as part of the Purchase Agreement. According to Chester, throughout the negotiations, she informed Senner that the Roca Defendants did not want to purchase the Rising Star Ball or have any involvement with Ares, whom Chester believed had a bad reputation in the dance community. Chester further testified that the Roca Defendants did not host an amateur dance competition in a second ballroom as part of the 2010 and 2011 Hotlanta Competitions because that was "Ares' competition" and they "did not purchase it."

Ares likewise testified that the Roca Defendants did not intend to purchase any assets associated with the Rising Star Ball, which would include the trademark and the right to host the competition. Furthermore, in their respective affidavits, Chester and Daza averred that Senner represented to them on several occasions that the Rising Star Ball would not be part of the sale of the assets of HDC to Roca Properties and that Ares would take the Rising Star Ball and operate it on his own.

Counsel for Roca Properties likewise testified that the parties had several discussions about Ares and the Rising Star Ball, and that it was made clear to Senner that Chester did not want to work with Ares. According to Roca Properties' counsel, all of the parties understood through their discussions that Ares would continue to operate the Rising Star Ball on his own and that any assets associated with that amateur competition would not be purchased as part of the sale. Reeves, the potential investor in Roca Properties who was involved in the negotiations, also testified that Senner represented to him that she was not including the Rising Star Ball as part of the sale.

Finally, "[t]he subsequent conduct of the parties to an agreement may be considered as evidence of their intent." *Tidwell v. Bassett*, 271 Ga. App. 867, 869 (611 SE2d 123) (2005). The evidence showed that a month after the parties entered

20

into the Purchase Agreement, the HDC Plaintiffs and Ares executed the Non-Compete Agreement under which the HDC Plaintiffs agreed to transfer to Ares "any and all interest in the Rising Star Newcomers Circuit," "any and all interest in the Rising Star Newcomers Ball," and "[a]ny and all interest in the Georgia entity registered with the Secretary of State and known as 'Rising Star Newcomers Ball, Inc.'" Indeed, after the parties entered into the Purchase Agreement, Ares organized and operated the Rising Star Circuit, which included an amateur dance competition held every year in October in Atlanta, without any protest from the parties. This evidence further indicates that the parties never contemplated that the Roca Defendants would obtain a right or interest in holding the Rising Star Ball; instead, all of those rights were retained by Ares.

It is true that the HDC Plaintiffs presented evidence supporting a different view of the Rising Star Ball and of what the parties intended to be conveyed in the Purchase Agreement. But given the evidence produced by the Roca Defendants, there is a genuine issue of material fact as to whether the Rising Star Ball was a separate event from the Hotlanta Competition, and whether the Roca Defendants were conveyed any interest or right in holding the Rising Star Ball as part of the Purchase Agreement. If a jury were to find that the Rising Star Ball was a separate event and

21

that the Roca Defendants were not conveyed any rights to it, a jury could likewise find that Senner's inclusion of the number of paid entries for the Rising Star Ball in the number for the 2009 Hotlanta Competition provided to the Roca Defendants was misleading and constituted a false representation. Thus, the trial court based its grant of summary judgment to the HDC Plaintiffs on an erroneous ground.

(b) *Financial Information about the 2009 Hotlanta Competition.* In opposing summary judgment, the Roca Defendants also alleged that they had been fraudulently induced to enter into the notes and guarantees by Senner's misrepresentations about the financial condition of HDC in 2009. Specifically, the Roca Defendants contended that Senner's handwritten notes provided to them during the negotiations included revenue and profit figures for the 2009 Hotlanta Competition that were grossly inflated and misled them about the true financial condition of HDC. In contrast, the HDC Plaintiffs contended that Senner's notes were simply projections for additional revenue sources and lower operating expenses for the Hotlanta Competition in future years and thus could not provide the basis for a claim of fraudulent inducement.

Agreeing with the HDC Plaintiffs, the trial court found that the uncontroverted evidence showed that the handwritten notes provided to the Roca Defendants by Senner contained mere projections for growth in future years, not representations

22

about the financial performance of the 2009 Hotlanta Competition. The trial court further found that there was no evidence that the Roca Defendants relied on the handwritten notes as representations of the performance of the Hotlanta Competition in 2009 when deciding to enter into the purchase transaction. As such, the trial court concluded that there was no evidence of any fraudulent misrepresentations by Senner about the profitability of the Hotlanta Competition in 2009 and no evidence of reliance by the Roca Defendants on the handwritten notes. We disagree with both of these conclusions reached by the trial court.

(i) *The Interpretation of Senner's Handwritten Notes.* Our precedent makes clear that under Georgia law,

> mere opinions, predictions, and conjectures relating to future events cannot form the basis of a fraud claim. It is axiomatic that a false representation made by a defendant, to be actionable, must relate to an existing fact or a past event. Fraud cannot consist of mere broken promises, unfilled predictions or erroneous conjecture as to future events. Representations concerning expectations and hopes are not actionable.

(Citation and punctuation omitted.) *Greenwald v. Odom*, 314 Ga. App. 46, 52-53 (1) (723 SE2d 305) (2012).

23

Here, Senner's handwritten notes are undated and do not contain any notations stating the purpose of the notes. The first page of the notes lists revenue sources for the Hotlanta Competition with total revenue listed as "356,595 - 373,765." The second page again lists revenue sources and includes a total revenue figure of $373,765. The final page details a list of expenses for the Hotlanta Competition totaling $186,000.

Senner submitted an affidavit in which she averred that the notes were not intended to represent the financial performance of the Hotlanta Competition in 2009. Rather, she averred that the notes were nothing more than projections for additional revenue sources and lower expenses for the operation of the Hotlanta Competition in future years. In her affidavit, Senner went through each line of her notes in an effort to explain how the figures represented projections for future revenues and expenses, and she pointed out that her notes listed a range of possible revenue and rounded expense figures, consistent with the numbers being projections of future performance.

The trial court agreed with Senner's interpretation of the handwritten notes. But the Roca Defendants presented evidence that the notes were intended to provide them with information about the financial performance of the Hotlanta Competition in 2009, given that the 2009 tax return and other financial documents for that year were

24

not available for their review. Specifically, Daza testified that Senner's handwritten notes were shown to the Roca Defendants during a meeting before the purchase transaction and were intended to provide them with the financial numbers for the 2009 Hotlanta Competition. According to Daza, the notes contained rounded figures in certain places because Senner could not remember the exact numbers when she wrote out her notes. Likewise, Roca Properties' counsel testified that he was provided a copy of the handwritten notes from HDC's attorney and was told that the notes were intended to represent the revenues and expenses for 2009. Lastly, Reeves averred in his affidavit that the parties attended an in-person meeting with Senner on March 10, 2010, and his own notes from that meeting reflect that Senner informed them that total revenues for 2009 were $356,000, total expenses were $186,000, and total profit was $170,000, which was generally consistent with information contained in Senner's handwritten notes.

In light of the conflicting evidence regarding Senner's handwritten notes, the trial court erred in concluding that the uncontroverted evidence showed that the notes were mere projections of future performance and thus were non-actionable predictions and conjecture about future events. Construed in favor of the Roca Defendants, the evidence would support a finding that the handwritten notes were

25

provided by Senner to supply the Roca Defendants with information about the financial performance of the Hotlanta Competition in 2009, and thus could support a claim for fraudulent inducement.

(ii) *Reliance on Senner's Handwritten Notes.* Critical to any fraud claim is proof that the victim actually relied on the representation forming the basis for his or her claim. *Bithoney v. Fulton-DeKalb Hosp. Auth.*, 313 Ga. App. 335, 344 (2) (721 SE2d 577) (2011). Generally, questions about reliance are for the jury to determine. *Orion Capital Partners, L.P. v. Westinghouse Elec. Corp.*, 223 Ga. App. 539, 542 (2) (b) (478 SE2d 382) (1996).

The trial court erred in finding that there was no evidence that the Roca Defendants relied on Senner's handwritten notes as representations of the 2009 financial performance of the Hotlanta Competition when deciding to enter into the purchase transaction. Chester and Daza averred in their affidavits that they executed the Purchase Agreement and other closing documents based on Senner's representations to them and based on the financial documents provided to them as part of the negotiations over the purchase transaction, which included Senner's handwritten notes. Furthermore, Ares testified in his deposition that the numbers in the handwritten notes "were mostly the numbers we were basing our purchase" of

26

HDC's assets on. This affidavit and deposition testimony, combined with the evidence presented by the Roca Defendants discussed supra in Division 1 (b) (i), would support a finding that the Roca Defendants actually relied on Senner's handwritten notes as representations of the 2009 financial performance of the Hotlanta Competition in deciding to enter into the Purchase Agreement and other closing documents. It follows that the trial court erred in concluding that there was no evidence of reliance on the handwritten notes.

(c) In summary, fraudulent inducement can serve as a defense to a claim for breach of a note or guaranty. *Jocelyn Canyon, Inc.*, 292 Ga. App. at 611; *Morgan*, 155 Ga. App. at 837 (1). In the present case, there are issues of fact regarding whether the HDC Plaintiffs made any false representations to the Roca Defendants about the number of paid entries and financial performance of the 2009 Hotlanta Competition as part of the negotiations over the purchase transaction, and whether the Roca Defendants actually relied on the alleged misrepresentations about the 2009 financial performance. The trial court erred in concluding otherwise and in granting summary judgment to the HDC Plaintiffs on their claims for breach of the promissory notes and personal guarantees based on those erroneous legal conclusions.

2. The trial court granted summary judgment in favor of the HDC Plaintiffs on their claim for attorney fees and on all of the Roca Defendants' counterclaims for the same reasons that it granted summary judgment to the HDC Plaintiffs on their claims for breach of the notes and guarantees. Hence, the trial court erred in granting summary judgment to the HDC Plaintiffs on the attorney fees claims and the counterclaims for the same reasons previously discussed.

3. The HDC Plaintiffs raised several additional grounds for summary judgment that were not addressed or ruled upon by the trial court in its order. Pursuant to *City of Gainesville v. Dodd*, 275 Ga. 834, 838-839 (573 SE2d 369) (2002), we exercise our discretion and decline to address the additional grounds not ruled upon by the trial court. See *Medical Center of Central Ga. v. City of Macon*, __ Ga. App. __ (2) (Case No. A13A1928, decided March 27, 2014). Consequently, we vacate the trial court's summary judgment order and remand for the trial court to consider in the first instance the additional grounds raised by the HDC Plaintiffs in support of their motion for summary judgment. See id.; *City of Gainesville*, 275 Ga. at 838-839.

*Judgment vacated and case remanded with instruction. Boggs and Branch, JJ., concur.*

28