**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

June 16, 2023

# In the Court of Appeals of Georgia

A23A0047. IRONSHORE SPECIALTY INSURANCE COMPANY
v. RPG HOSPITALITY, LLC.

MILLER, Presiding Judge.

This case involves a dispute between RPG Hospitality, LLC, the owner of a hotel on the North Carolina coast, and Ironshore Specialty Insurance Company over whether the full limit of a commercial property insurance policy covers the damage to RPG's hotel caused by a hurricane. The trial court concluded that the full limit of the policy applied, and Ironshore now appeals, arguing that (1) the trial court erroneously determined that the insurance policy unambiguously provides wind-driven rain coverage up to the full policy limit; and that (2) the trial court erred when it dismissed Ironshore's counterclaim for equitable reformation of the policy based on an alleged mutual mistake as to whether the policy provided full coverage for

wind-driven rain damage. We conclude that genuine issues of material fact remain as to whether the insurance policy provided wind-driven rain coverage up to the full policy limit, and so we are compelled to reverse the trial court's order on that issue. We affirm, however, the trial court's grant of partial summary judgment on Ironshore's counterclaim.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citation omitted.) *Wade v. Allstate Fire & Cas. Co.*, 324 Ga. App. 491 (751 SE2d 153) (2013).

So viewed, the record shows that RPG owns a DoubleTree hotel in New Bern, North Carolina. In March 2017, RPG engaged J. Smith Lanier & Co. and R-T Specialty, LLC, to help negotiate and secure a commercial insurance policy for the hotel. RPG eventually acquired an insurance policy with Liberty Surplus Insurance. The policy provided for a full policy coverage of $26,239,400 per incident, with coverage for damage caused by wind-driven rain up to $250,000 per incident.

In early 2018, Liberty informed J. Smith Lanier that it would not renew RPG's policy because of a merger between Liberty and Ironshore, and Liberty advised that J. Smith Lanier could obtain an equivalent policy with Ironshore. J. Smith Lanier informed RPG of the change and told them that they were receiving a "renewal" for RPG. Ironshore provided J. Smith Lanier with a quote that contained a similar full coverage provision of $26,239,400 per incident and a $250,000 sublimit for wind-driven rain damage. RPG agreed to those terms, and J. Smith Lanier accepted the policy on RPG's behalf. When the new policy became effective in March 2018, Ironshore provided RPG with a binder that included the terms of the policy, including the $250,000 limit for wind-driven rain damage.

When the actual insurance policy was memorialized and assembled, the portion relevant to wind-driven rain provided the following:

> Subject to the terms and conditions of the Policy and the applicable Sub-Limit of Liability, this Policy provides coverage for direct physical loss or damage to the interior of any building or structure, or the property inside the building or structure caused by Wind Driven Rain.

> Wind Driven Rain means rain, snow, sand or dust pressing on or flowing or seeping through the roofs, doors, windows, or other openings of the building or structure. The most we will pay for loss or damage

caused by Wind Driven Rain is the Wind Driven Rain Sub-Limit of Liability shown in the Sub-Limit Provision Endorsement.

Several documents related to the policy, however, including the Sub-Limit Provision Endorsement, were not included with the policy. Ironshore's underwriter could not remember whether he had reviewed the policy at the time it was issued, he could not recall asking any other individual to review it, and no one else at Ironshore apparently reviewed the policy. RPG, J. Smith Lanier, and R-T Specialty all reviewed the policy around the time it was issued, but none of them noticed the omission of the sub-limit endorsement.

In June 2018, Ironshore's senior vice president conducted an audit of the policy, discovered that "[n]one of the binder sublimits made it onto the policy," concluded that there was no "evidence of a form/policy review" by the underwriter, and also concluded that the "[b]ooking needs to be corrected and sublimits added to the policy." Ironshore removed the underwriting authority of the underwriter who wrote the policy, but it did not inform RPG of the mistakes it discovered in the policy at the time. Ironshore's internal emails showed that it wanted to focus on "going forward" and "getting it right" in the future, and it did not inform RPG of its findings.

4

On September 14, 2018, Hurricane Florence struck the coast of North Carolina and caused catastrophic damage to RPG's hotel. In the week after the hurricane made landfall, RPG engaged companies and a claims adjuster to repair and mitigate the damage at the hotel. Ironshore's claims adjuster visited the hotel and also monitored the mitigation work. Ironshore approved a request to have the contractors demolish certain areas of the hotel, and mitigation work that ultimately amounted to millions of dollars was performed on the property.

RPG's claims adjuster eventually informed RPG that certain necessary documents were missing from its insurance policy. RPG then noticed that the policy was indeed missing certain documents, including the sub-limit endorsement. J. Smith Lanier contacted Ironshore to correct the policy, and on September 21, 2018, Ironshore sent an endorsement containing most of the missing documents, but not the sub-limit endorsement, and RPG agreed that the provisions in the documents became a part of the policy. On September 25, 2018, RPG told Ironshore's claims adjuster that the policy contained full coverage for wind-driven rain damage.

On October 10, 2018, Ironshore attempted to add the missing sub-limit provision endorsement, stating that the sub-limit was "left off" the Policy "giving

[RPG] the perception of full limits" of coverage for wind-driven rain damage.[1] RPG refused to accept the endorsement. Ironshore refused to accept any further claims of damage, asserting that the policy limited damage for wind-driven rain to $250,000.

RPG filed the instant complaint against Ironshore, J. Smith Lanier, and Jan Johnson (J. Smith Lanier's account manager for RPG), asserting claims against Ironshore for breach of contract, negligent adjustment, and bad faith failure to settle a claim and seeking compensatory and punitive damages. Ironshore answered the complaint and asserted a counterclaim to reform the policy due to an alleged mutual mistake as to the supposedly inadvertent omission of the sub-limit endorsement. The parties filed cross-motions for summary judgment on the disputed issue of whether the policy provided coverage for wind-driven rain that was limited to $250,000 or whether it provided the full policy limit of $26,239,400. Following a hearing, the trial court first concluded as a matter of law that the policy provided the full coverage amount of $26,239,400 for wind-driven rain damage because, while the policy referred to a sub-limit endorsement, it did not actually include any such endorsement or any other limit for coverage for wind-driven rain damage. The trial court next

---

[1] At the time, the total damage to the hotel was noted by Ironshore to be over $10 million, with the mitigation efforts costing $3-4 million, accumulated repairs costs amounting to $4 million, and lost income also costing around $4 million.

6

concluded that summary judgment was warranted against Ironshore on its counterclaim for reformation because the mistake was entirely caused by Ironshore's own negligence in failing to review the policy and that RPG was not unreasonable in interpreting the policy to not include any limits on the amount of wind-driven rain coverage. This appeal followed.

1. Ironshore first argues that the trial court erred when it concluded that the terms of the policy unambiguously provide coverage for wind-driven rain up to the full policy limit. We determine that there are fact issues remaining as to the contents of the contract as written.

> In this State, the construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

(Citation and punctuation omitted.) *Simpson v. Infinity Select Ins. Co.*, 269 Ga. App. 679, 681 (605 SE2d 39) (2004).

7

> Insurance in Georgia is a matter of contract and the parties to the contract of insurance are bound by its plain and unambiguous terms, and, when the words in an insurance policy are plain and obvious, they must be given their literal meaning. Further, insurance contracts are interpreted by ordinary rules of contract construction and exclusions are to be strictly construed. . . . The construction of an unambiguous contract is a question of law for the court.

(Citations and punctuation omitted.) *State Farm Fire & Cas. Co. v. Goodman*, 259 Ga. App. 62, 63-64 (2) (576 SE2d 49) (2002).[2] Additionally, we note that, generally, "[i]nsurance policies are construed in favor of the insured and against the insurance company." Id. "[T]he test is not what the insurer intended its words to mean, but rather what a reasonable person in the insured's position would understand them to mean." (Citation omitted.) *American Strategic Ins. Co. v. Helm*, 327 Ga. App. 482, 486 (759 SE2d 563) (2014).

Here, the insurance policy stated that it covered "[a]ll Risks of Direct Physical Loss or Damage excluding Flood and including Earthquake, EQSL and Equipment

---

[2] While there seems to be some dispute among the parties as to whether Georgia law or North Carolina law applies to this lawsuit, the trial court applied Georgia law in its order construing the insurance policy, and neither party has officially enumerated the trial court's choice of law as error. Accordingly, we will also apply Georgia law to examine the correctness of the trial court's ruling.

Breakdown" and that it covered "the perils of tornado, cyclone, *hurricane, windstorm*, hail, flood, . . . [.]" The policy contained an endorsement which added the following language:

> Subject to the terms and conditions of the Policy and the applicable Sub-Limit of Liability, this Policy provides coverage for direct physical loss or damage . . . caused by Wind Driven Rain. . . . The most we will pay for a loss or damage caused by Wind Driven Rain is the Wind Driven Rain Sub-Limit of Liability shown in the Sub-Limit Provision Endorsement.

However, no such "sub-limit provision endorsement" was included in the insurance policy. The wind-driven rain endorsement also contained no such sub-limit. Our rules of contract construction also cannot resolve this ambiguity. The rule that we generally construe insurance policies "in favor of the insured and against the insurance company[,]" *State Farm Fire & Cas. Co.*, supra, 259 Ga. App. at 63 (2), would certainly counsel in favor of construing the policy to simply have no applicable wind-driven rain sub-limit since none appeared in the final policy. However, our rules of contract interpretation also provide that "[t]he construction which will uphold a contract in whole and in every part is to be preferred," OCGA § 13-2-2 (4), and construing this wind-driven rain endorsement to not have any applicable sub-limit

9

would essentially render the entire wind-driven rain endorsement, a provision that the parties separately signed and agreed upon, completely meaningless.

Nevertheless, "[i]f the writing appears on its face to be an incomplete contract and if the parol evidence offered is consistent with and not contradictory of the terms of the written instrument, then the parol evidence is admissible to complete the agreement between the parties." (Citation omitted.) *Jordan v. Tri County AG, Inc.*, 248 Ga. App. 661, 663 (1) (546 SE2d 528) (2001). This is allowed when "it is manifest that the writing was not intended to speak the whole contract[.]" (Citation omitted.) Id.; see OCGA § 13-2-2 (1). We conclude that the endorsement's reference to "*the* Sub-Limit Provision Endorsement" along with the important qualifying sentence that "[t]he most we will pay for a loss or damage caused by Wind Driven Rain is the Wind Driven Rain Sub-Limit of Liability shown in the Sub-Limit Provision Endorsement[]" demonstrates that the policy is manifestly incomplete on its face without such sub-limit. See *Jordan*, supra, 248 Ga. App. at 663-664 (1) (line of credit agreement was manifestly incomplete when it contained no provisions as to payments or obligations to pay the line of credit); *Doyle v. Estes Heating & Air Conditioning, Inc.*, 173 Ga. App. 491, 493 (2) (326 SE2d 846) (1985) (contract to

10

install equipment was manifestly incomplete when it contained no provisions for testing the equipment and the clean-up afterward).

RPG argues that Ironshore is barred from presenting evidence to complete the contract by citing the policy's merger clause, which provided that "[t]his policy contains all the agreements between you and us concerning the insurance afforded." An "entire agreement" clause, however, does not prevent the admission of parol evidence to explain ambiguities already existing in the contract, and the insurance policy's reference to a sub-limit that was not contained in the final contract is an ambiguity within the contract itself. See *Baker v. Jellibeans, Inc.*, 252 Ga. 458, 459 (1) (314 SE2d 874) (1984) ("entire agreement" clause did not prevent the consideration of parol evidence to explain the terms of an option contract that, on its own, was vague and indefinite); see also OCGA § 24-3-3 (b) ("Parol evidence shall be admissible to explain all ambiguities, both latent and patent."). Thus, the merger clause did not prevent the trial court from considering parol evidence to determine the meaning of the ambiguity that already existed in the contract.

Having concluded that parol evidence was admissible to explain the policy's reference to a sub-limit that was missing from the final policy, we conclude that the actual parol evidence submitted by the parties creates a fact issue that would survive

summary judgment. See *Roca Properties, LLC v. Dance Hotlanta, Inc.*, 327 Ga. App. 700, 707-708 (1) (a) (ii) (761 SE2d 105) (2014) ("[I]f the parol evidence is in conflict, the question of what the parties intended becomes a factual issue for the jury.") (citation and punctuation omitted). RPG and the trial court focus on evidence that was presented of other policies Ironshore underwrote, particularly one wherein an identical wind-driven rain endorsement was included in the policy, but the policy similarly failed to include the actual sub-limit amount, and Ironshore accepted that the policy provided full coverage for wind-driven rain damage. While this evidence is certainly probative, it does not conclusively answer the question of what the parties intended *this* policy to mean, particularly in light of the parol evidence recounted above of the parties' negotiations, which include at least some indications that the parties here intended there to be a sub-limit for wind-driven rain damage included in the final policy.

This tension in the evidence creates a fact issue as to whether the final terms of the agreement included the wind-driven rain sub-limit. We are therefore compelled to conclude that the trial court erred by granting summary judgment on this issue.

2. Ironshore also argues that the trial court erred by granting summary judgment on its counterclaim for reformation of the contract based on an alleged

12

mutual mistake as to the failure of the insurance policy to include a sub-limit for wind-driven rain coverage. We conclude that the trial court correctly determined that the reformation claim failed as a matter of law.

> A mistake relievable in equity is some unintentional act, omission, or error arising from ignorance, surprise, imposition, or misplaced confidence. Where reformation is sought on the ground of mutual mistake, it must, of course, be proved to be the mistake of both parties. The power to relieve mistakes shall be exercised with caution; to justify it, the evidence shall be clear, unequivocal, and decisive as to the mistake.

(Citations and punctuation omitted.) *CS-Lakeview at Gwinnett, Inc. v. Simon Property Group, Inc.*, 283 Ga. 426, 427 (659 SE2d 359) (2008). "The cause of the defect is immaterial so long as the mistake is common to both parties to the transaction. And the negligence of the complaining party will not defeat his right to reformation if the other party has not been prejudiced." (Citation omitted.) *Whitcomb v. Bank of America, N.A.*, 365 Ga. App. 795, 798 (2) (880 SE2d 310) (2022); see OCGA § 23-2-32 (b).

Even assuming that Ironshore has established by "clear, unequivocal, and decisive" evidence that the parties made a mutual mistake as to wind-driven rain coverage, reformation is not available to Ironshore because RPG has established that

the mutual mistake was caused by the negligence of Ironshore and its employees and that it would be prejudiced by allowing a reformation. The sub-limit provision endorsement was accidentally left out of the policy by the Ironshore employee who was preparing the documents. Ironshore's underwriter could not definitively say that he had reviewed the policy at the time it was issued, no one else at Ironshore apparently reviewed the policy. In June 2018, Ironshore's senior vice president conducted an audit of the policy, discovered that "[n]one of the binder sublimits made it onto the policy," concluded that there was no "evidence of a form/policy review" by the underwriter, and also concluded that the "[b]ooking needs to be corrected and sublimits added to the policy." Ironshore failed to take any steps to communicate the omission to RPG or to correct the policy upon discovering the mistake. Thus, the record shows that the alleged mutual mistake was caused by Ironshore's negligence.

Additionally, RPG produced evidence that, after the hurricane struck the hotel, it engaged in extensive mitigation efforts that well exceeded the alleged $250,000 sub-limit amount, including demolition of parts of the hotel, that were all approved by Ironshore during the course of the mitigation work. At the time, RPG was operating under the assumption that it had coverage for wind-driven rain damage up to the full policy limits, and, in fact, it had informed Ironshore of its understanding

14

that there was no sub-limit for wind-driven rain damage. It is true that Georgia law provides that "a party cannot be hurt by reforming the instrument, so as to keep them from getting what they did not buy." (Citation omitted.) *Ledford v. Smith*, 274 Ga. App. 714, 727-728 (4) (618 SE2d 627) (2005). Here, however, RPG took certain, extensive, irreversible actions, such as the demolition of its property, while apparently relying on the alleged mistake that there was no special limit for the coverage of wind-driven damage. RPG's senior vice president of operations testified that had RPG known that Ironshore might deny coverage, their response to the hurricane would have been different. Specifically, considering the "devastating and catastrophic" damage to the hotel, RPG would have considered filing for bankruptcy, or it would have "start[ed] over with one or both of the hotel buildings rather than performing immediate and expensive mitigation work[.]" RPG's claims adjustor also stated that the recommended plan for handling the damage to the hotel would have changed depending on whether there was adequate coverage. When Ironshore finally attempted to correct its mistake and add the sub-limits back to the policy, the total repairs to the hotel was noted by Ironshore to amount to over $10 million, with the mitigation efforts costing $3-4 million, accumulated repair costs amounting to $4 million, and lost income also costing around $4 million. Reformation of the contract

15

based on mutual mistake thus cannot return RPG to the status quo. See *First Nat. Bank of Polk County v. Carr*, 260 Ga. App. 439, 442 (5) (579 SE2d 863) (2003) (property owner demonstrated that he would be prejudiced by reformation of a security deed when the property owner had made improvements and repairs to the property in the intervening time); compare *Black v. Nationstar Mortg., LLC*, 344 Ga. App. 217, 221-222 (a) (809 SE2d 487) (2018) (parties failed to demonstrate how they would be prejudiced by the reformation of a security deed when such reformation "would only act to place the parties in the same position they occupied before the foreclosure"). RPG has thus proven that it has suffered prejudice so as to defeat Ironshore's claim for reformation.

Further, Ironshore was aware that RPG's insurance policy did not contain the relevant sub-limit document, a fact which it did not communicate to RPG until after it had approved the completion of extensive and costly work. See *Phillips v. Hayes*, 212 Ga. 148 (91 SE2d 19) (1956) ("Equity favors the diligent and not those who sleep on their rights.") (citation omitted). Ironshore argues that the trial court erred in concluding that its reformation claim was barred by its delay in waiting until October 2018 to attempt to enforce the sub-limit, arguing that its delay of a few months was too brief to constitute laches, but "[l]aches is not a matter of time but a question of

inequity founded on a change in conditions." (Citation omitted.) *Whitfield v. Whitfield*, 204 Ga. 64, 67 (2) (48 SE2d 852) (1948). The trial court did not err in concluding that the destruction of the hotel followed by the extensive demolition and mitigation work performed with Ironshore's approval caused a change of conditions that would invoke the doctrine of laches. See *Parker v. Fisher*, 207 Ga. 3, 6 (59 SE2d 715) (1950) ("Equity will relieve against mutual mistake, but only at the instance of a complainant who moves with reasonable diligence. What is a reasonable time must necessarily depend upon the peculiar facts and environments of the particular case.") (citation omitted).

Accordingly, we reverse the trial court's grant of partial summary judgment in RPG's favor determining that the full policy coverage of $26,239,400 applied to wind-driven rain damage, rather than the alleged $250,000 sublimit, but we affirm the grant of summary judgment on Ironshore's reformation claim.

*Judgment affirmed in part and reversed in part. Mercier and Hodges, JJ., concur.*